IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ELIZABETH WALTON-HORTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-CV-268-WKW [WO] |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Elizabeth Walton-Horton ("Walton-Horton") brings this action against Hyundai Motor Manufacturing Alabama, LLC ("HMMA"), Tommy Certain ("Certain"), and Eric George ("George"), (collectively "Defendants"), alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and various state-law claims. This cause is before the court on Defendants' motion for summary judgment on all claims. (Doc. # 56.) Walton-Horton opposes the motion. (Doc. # 62.) After careful consideration of counsels' briefs, the relevant law, and the record as a whole, the court finds that Defendants' motion is due to be granted.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The parties do not contest personal jurisdiction or venue, and there are adequate allegations in support of each.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of Walton-Horton's termination from HMMA in March 2006 for alleged violations of HMMA's employment policy.   Walton-Horton claims that the termination was because of her sex and in retaliation for complaints she made about two male co-workers, Certain and George.  Walton-Horton further asserts claims for defamation, libel, slander, and negligent/wanton supervision.  Viewed in the light most favorable to Walton-Horton, the evidentiary submissions of the parties establish the following facts.

## A.    **Factual Background**

Walton-Horton began working for HMMA in February 2005 as a Technical Support Specialist for the Production Control Department.  (Am. Compl. ¶ 14 (Doc. # 49); Pl.'s Dep. 72-74 (Ex. A to Defs.' Summ. J. Br. (Doc. # 57).)  She worked the day shift for a short period before moving to the night shift, where she remained for the duration of her employment with HMMA.  (Pl.'s Dep. 83.)  George and Certain worked with Walton-Horton in the Production Control Department on the same shift.  (Pl.'s Dep. 80.)  All three were hourly, non-management employees with similar job responsibilities.  (Pl.'s Dep. 81, 163-64.)  Walton-Horton initially worked in the same building with Certain and George and had an assigned cubicle near them.  (Pl.'s Dep. 91.)  In June 2005, she moved to the Paint Shop in a separate building.  (Pl.'s Dep. 101-03.)  While working in the Paint Shop, Walton-Horton's interaction with Certain and George was limited to occasional lunches and compiling information for the Technical Support Report at the end of the shift.  (Pl.'s Dep. 103-04.)

Walton-Horton testified that they spent "[a]bout an hour or two a day" together.  (Pl.'s Dep. 104.)

On March 10, 2006, Harry Chase, a Production Control Manager, informed the Team Relations Department at HMMA[1] that he had received a complaint from PC Specialist Trey Butler about Walton-Horton's use of inappropriate language in the workplace.  (Smith Decl. ¶ 3 (Ex. C to Defs.' Summ. J. Br.).)  After receiving notice of the complaint against Walton-Horton, Team Relations Assistant Manager Shaun Flate ("Flate") instructed Smith to investigate the allegations and "determine if [Walton-Horton] was indeed engaging in inappropriate behavior."  (Smith Decl. ¶ 3.)

During the course of the investigation, Smith interviewed ten of Walton-Horton's co-workers.  (Smith Decl. ¶ 4.)  She summarized the interviews in a March 15, 2006 "Team Relations Memo" to Flate (Ex. 5 to Smith Decl.) and, in a separate memorandum, provided a statement of her recommendations based on these interviews (Ex. 6 to Smith Decl.).  According to Smith's memos, the interviews conducted on March 10, 2006, and March 13, 2006, revealed the following about Walton-Horton's behavior in the workplace:

---

[1]According to Team Relations Specialist Gabriela Smith ("Smith"), the Team Relations Department at HMMA

provides training to team Members and new hires on policies and procedures, makes recommendations to management on corrective action, communicates with management on the application and interpretation of policies and procedures, and investigates claims of discrimination and harassment, as well as investigat[es] other work rule violations.

(Smith Decl. ¶ 2.)

3

(1)     Four employees – Certain, George, Ricky Trull, and Scott Smith – indicated
        that Walton-Horton had offered them her "jelly," a term understood by them
        to have sexual connotations.  Walton-Horton denied this fact, and contended
        that Certain gave her the nickname "Jelly Bean" after telling her that someone
        liked her and "wanted some of her jelly."

(2)     Five employees – Certain, George, Trey Butler, James Vaught, and Paula
        Ballard ("Ballard") – indicated that they had heard Walton-Horton use
        profanity.

(3)     Certain and Jackson Lancaster ("Lancaster") indicated that Walton-Horton had
        asked Lancaster to go out on a date with her on several occasions.  Lancaster
        stated that he was flattered, but that it bothered him that she asked him in front
        of another employee.

(4)     Lancaster stated that on one occasion, Walton-Horton told him (in front of a
        contractor), "You can have me with my tits all over you."

(5)     Certain and Scott Smith indicated that Walton-Horton had asked them, on
        more than one occasion, whether they found her attractive.  Scott Smith stated
        that Walton-Horton's insistence on a "yes" or "no" answer bothered him.

(6)     George indicated that Walton-Horton had said to him, "I bet you have a big
        dick, I can tell, I can tell just by looking at you."

(7)     George said that Walton-Horton thrust her breasts at other team members to
        get attention and that, on one occasion, Walton-Horton leaned over him while
        he was working on his computer and said, "Here rest this black tit on your
        ear."

(8)     Certain indicated that after telling Walton-Horton that she was wearing a nice
        dress, Walton-Horton lifted her dress to expose her "behind."

(9)     Several employees indicated that Walton-Horton had falsely stated that she
        was the niece of George Kimble, Director of Human Resources, thus creating
        fear of retaliation for speaking negatively about her.

(Exs. 5 and 6 to Smith Decl.)   Smith met with Walton-Horton to discuss the above

accusations on March 13, 2006.  (Ex. 5 to Smith Decl.)  Walton-Horton adamantly denied

all of the accusations made against her.  (Exs. 5 and 6 to Smith Decl.)  She also indicated during her interview with Smith on March 13, 2006, that there was a lot of joking at work, giving specific examples of profanity and sexually explicit jokes made by Certain and George.  (Ex. 5 to Smith Decl.)

On March 14, 2006, the day after the interviews concluded, Walton-Horton contacted Team Relations to make a complaint against Certain.  (Attach. 5 to Smith Decl.)  According to Smith's memos, Walton-Horton made the following complaints:

(1)    In reference to a surgery Walton-Horton had on March 7, 2006, Certain asked Walton-Horton whether she was "going to have [her] vagina tight."

(2)    Certain used the term "mother fucker."

(3)    Certain called another employee "faggot."

(4)    Certain told Walton-Horton that another female employee was a "carpet muncher," understood to be a derogatory term for a lesbian.

(5)    Certain referred to Walton-Horton's banana as a vibrator.

(6)    Certain called another female employee a "dike bitch."

(Attach. 5 to Smith Decl.)  Smith subsequently interviewed Certain, who admitted using profanity and calling a female employee "carpet muncher."  (Attach. 5 to Smith Decl.) Certain denied calling a male employee "faggot," but admitted saying that "I think he is a little sweet."  (Attach. 5 to Smith Decl.)  Certain denied using the term "dike bitch" and making any reference to Walton-Horton's surgery.  (Attach. 5 to Smith Decl.)  Smith's investigation into Certain's conduct at HMMA amounted to one interview with Ballard.

5

During that interview, Ballard stated that she heard Certain call another employee "faggot" and overheard a conversation between George and Certain in which the phrase "lesbian bitch" was used to refer to a female employee.  (Attach. 5 to Smith Decl.)

Based on the foregoing, Smith made the following recommendations:

It is my conclusion that in order to protect our team members as well as the company, Elizabeth [Walton-]Horton should be terminated due to her unlawful verbal, physical, and visual sexual harassment towards HMMA [employees]. . . . . It is also my recommendation that Tommie Certain receive[] a Serious Misconduct for the involvement he has had in the sexual innuendoes and profanity used at HMMA.

 (Attach. 6 to Smith Decl.)

Walton-Horton was terminated from HMMA on March 22, 2006, for "creat[ing] a hostile work environment of a sexual nature."  (Letter from Harry Chase, Production Control Manager, to Walton-Horton, Mar. 22, 2006 (Ex. 11 to Pl.'s Dep.).)  Certain received a Serious Misconduct Letter, the most severe form of punishment at HMMA short of discharge.  (Smith Decl. ¶ 12.)

Walton-Horton claims that her prior relationship with Certain served as the impetus for his detailed accusations against her during Smith's investigation.  Specifically, Walton-Horton contends that prior to the investigation that led to Walton-Horton's termination, she and Certain had a falling out concerning money Walton-Horton had loaned Certain and which he had not paid back.  (Am. Compl. ¶ 15; Pl.'s Resp. Br. 11.)  Walton-Horton also contends that she complained about Certain's misconduct in the workplace to four different

6

people on five separate occasions between April 2005 and February 2006,[2] and even requested that she be taken out of the rotation with Certain and George. (Pl.'s Dep. 142-56; Pl.'s Decl. ¶ 5.) There is no evidence that anything other than reprimands resulted from these complaints. (Pl.'s Dep. 142-56.)

## B.   **Procedural Background**

Walton-Horton filed an Amended Complaint on September 30, 2008 (Doc. # 49) alleging: (1) gender discrimination under Title VII against HMMA, (2) retaliation under Title VII against HMMA and Smith,[3] (3) defamation against Certain and George, (4) libel and slander against Certain, and (5) negligent and wanton supervision against HMMA. Defendants moved for summary judgment on all claims. (Doc. # 56.)

## III.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*); Fed. R. Civ. P. Rule 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

---

[2] According to Walton-Horton, she complained about Certain's sexually explicit comments and told a supervisor that she "was fed up with listening to Eric [George] and Tommy [Certain] demean[] . . . wom[e]n." (Pl.'s Dep. 152.)

[3] All claims against Smith were dismissed pursuant to this court's order entered November 14, 2008. (Doc. # 55.)

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex Corp.*, 477 U.S. at 324; Fed. R. Civ. P 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case. *Celotex Corp.*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  Furthermore, "[t]he mere existence of some factual dispute will not defeat

8

summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies, "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden

of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. DISCUSSION

### A.    Title VII Claims

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  Title VII also makes it unlawful to retaliate against an employee "because he [or she] has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e-3(a).  Because there is no direct evidence of discrimination or retaliation,[4] Walton-Horton's Title VII claims are governed by

---

[4] Walton-Horton claims in her response brief that there is direct evidence of discrimination (Pl.'s Resp. Br. 8), yet she produces no evidence to support this claim.  Direct evidence of discrimination is evidence "that the complained-of employment decision was *motivated* by the decision-maker's [sexism]." *Damon v. Fleming Supermarkets of Fla.,* 196 F.3d 1354, 1358-59 (11th Cir. 1999).  Thus, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [sex]' will constitute direct evidence of discrimination." *Id.* at 1359 (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)).  Moreover, Walton-Horton analyzes her claim under the

the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

"Under the *McDonnell Douglas* framework, a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination." *Brooks v. County Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer "to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action."[5] *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer meets its burden, the burden shifts back to the plaintiff to show that the employer's stated reason for the adverse employment action was a "pretext" for discrimination. *Id.* The pretext inquiry requires a determination, based upon the totality of the evidence, as to whether the plaintiff "'has cast sufficient doubt on the defendant's proffered nondiscriminatory reason[] to permit a reasonable factfinder to conclude that the employer's proffered legitimate reason[] [was] not what actually motivated its conduct.'" *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (brackets added)).

---

*McDonnell Douglas* framework. (Pl.'s Resp. Br. 9-11.)

[5] The principles in *Brooks* and *Crawford* apply equally to retaliation claims. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1305 (11th Cir. 1999) ("[T]he same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the *McDonnell Douglas* presumption.").

### 1.    *Sex Discrimination*

Walton-Horton can establish a *prima facie* case of disparate treatment on the basis of sex by showing that (1) she is a member of a protected class, (2) she was qualified for the job, (3) she suffered an adverse employment action, and (4) HMMA treated similarly situated male employees more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1386 (11th Cir. 1999); *McDonnell Douglas*, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield*, 115 F.3d at 1562.

Neither party disputes that Walton-Horton is a member of a protected class, was qualified for her job, and suffered an adverse employment action. Thus, the only issue is whether Walton-Horton has presented sufficient evidence to create a genuine issue of material fact that HMMA treated similarly situated male employees more favorably. To satisfy her burden in this respect, Walton-Horton must show that male employees were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Holifield*, 115 F.3d at 1562. In other words, Walton-Horton must show that "[she] and the employees are similarly situated *in all relevant respects*." *Id.* (emphasis added). In *Maniccia*, the Eleventh Circuit interpreted this standard to "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." 171 F.3d at 1368.

Defendants contend that Walton-Horton has failed to show that "the quantity and quality" of Certain's misconduct was "nearly identical" to Walton-Horton's misconduct. Specifically, Defendants argue that Walton-Horton's complaints about Certain – that he used profanity and sexually explicit language – are not comparable to the misconduct that numerous employees attributed to Walton-Horton – namely, profanity, intimidation, and sexually-suggestive statements and actions.

While offensive, Certain's alleged misconduct does not rise to the level of Walton-Horton's. Although both Walton-Horton and Certain allegedly used profane, sexually-explicit language in the workplace, Walton-Horton fails to present any evidence that Certain ever inappropriately touched another employee or exposed himself. Nor does she present any evidence that Certain propositioned or otherwise intimidated other employees. Although HMMA interviewed ten people regarding Walton-Horton's conduct and only one person regarding Certain's conduct, Walton-Horton does not argue the sufficiency of HMMA's investigation. Instead of deposing other HMMA employees to determine the extent of Certain's alleged misconduct, Walton-Horton relies solely on her own deposition and declaration testimony. The court cannot speculate as to what a more detailed investigation *could* have revealed regarding Certain's conduct. The evidence before the court shows that Walton-Horton's alleged misconduct – including inappropriate touching, exposing herself, and asking co-workers out on dates – was more severe in terms of both quantity and quality than that of Certain. Thus, having failed to point to a similarly situated male employee,

Walton-Horton has not established a *prima facie* case under *McDonnell Douglas*. Accordingly, Defendants' motion for summary judgment on Walton-Horton's Title VII sex discrimination claim is due to be granted on this record.

### 2.   *Retaliation*

To establish a *prima facie* case of retaliation, Walton-Horton must show: "(1) that [s]he engaged in statutorily protected expression; (2) that [s]he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield*, 115 F.3d at 1566.  At issue here are elements (1) and (3).

Walton-Horton contends that she engaged in protected expression when she reported Certain's and George's conduct on five separate occasions.  Even on the assumption that this speech constitutes "statutorily protected expression," Walton-Horton has failed to meet her burden under the third prong of her *prima facie* case.

The third element's causal relationship can be established through evidence "'that the protected activity and the adverse action were not wholly unrelated.'"  *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)).  In *Brungart*, the Eleventh Circuit explained that "[t]he *general rule* is that close proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."  *Id.* (emphasis added).  *Brungart*, however, recognized that "there is this exception" to that general rule: "[T]emporal proximity alone is insufficient

14

to create a genuine issue of fact as to causal connection where there is *unrebutted* evidence that the decision maker did not have knowledge that the employee engaged in protected conduct. *Id.* (emphasis added); *see also McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (Affirmative, uncontradicted evidence that the decision maker was unaware of the protected activity defeated the *prima facie* causation element of the plaintiff's retaliation claim.). "A decision maker cannot have been motivated to retaliate by something unknown to [her]." *Brungart*, 231 F.3d at 799.

Walton-Horton testified that she complained about Certain and George to Kuyong Jung, in April 2005, Greg Stroud, in May 2005, Greg Kimble, in December 2005, and someone named "Marcus," in January and February 2006. (Pl.'s Dep. 142-56; Pl.'s Decl. ¶ 5.) There is no evidence, however, that any of these individuals played a part in the investigation that led to Walton-Horton's termination. Rather, the evidence reveals that Flate instructed Smith to investigate the allegations of Walton-Horton's inappropriate behavior, and Smith was the one who conducted the investigation and recommended Walton-Horton's termination based on this investigation. (Smith Decl. ¶ 3.) Moreover, Smith states in her declaration that her interview with Walton-Horton on March 14, 2006 was "the first time [she] was aware of Ms. [Walton-]Horton making any complaints of inappropriate behavior at HMMA." (Smith Decl. ¶ 4). Walton-Horton has failed to present any evidence, circumstantial or otherwise, that prior to this date, Smith was aware of Walton-Horton's prior complaints about Certain and George. Because the investigation that led to Walton-Horton's

15

termination had already begun at that point, it cannot reasonably be argued that Walton-Horton's complaint on March 14, 2006, after said investigation, caused her termination. *Cf. Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

Walton-Horton claims that the mere temporal proximity of these complaints to her termination on March 22, 2006 creates an inference of causality. (Pl.'s Resp. 12.) However, timing alone is insufficient to establish the causation element when the evidence is unrebutted that the HMMA agent who actually took the adverse action against Walton-Horton was unaware of the alleged protected conduct. *See Brungart*, 231 F.3d 799. As stated, Defendants have presented evidence that Smith was not aware of the complaints made by Walton-Horton prior to the March 14 interview (Smith Decl. ¶ 4), and Walton-Horton has failed to present any evidence showing that a genuine issue of material fact exists on this point. *See Celotex Corp.*, 477 U.S. at 322-24. For these reasons, Walton-Horton's Title VII claim for retaliation cannot survive summary judgment.

C.    **State-Law Claims**

   *1.    Defamation*

Defamation, which encompasses both libel and slander,[6] carries a two-year statute of

---

[6] Walton-Horton purports to bring a defamation claim against Certain and George and a libel and slander claim against Certain. However, because defamation encompasses both libel and slander, *see*

limitations.  Ala. Code § 6-2-38(k).  The statute of limitations "begins to run at the time [the cause of action] accrues, that is, when the defamatory matter is published."  *Tonsmeire v. Tonsmeire*, 233 So. 2d 465, 467 (Ala. 1970).  The alleged defamatory statements in this case were made before Walton-Horton was terminated on March 22, 2006.  Walton-Horton commenced this lawsuit when she filed her complaint on April 7, 2008 (Doc. # 1), more than two years after her claims accrued.  Thus, Walton-Horton's defamation claims against Certain and George and her libel and slander claims against Certain are time-barred,[7] and Defendants' motion for summary judgment on these claims is due to be granted.

### 2.    *Negligent and Wanton Supervision*

A claim for negligent and/or wanton supervision must be brought within two years of the time the cause of action accrues.  Ala. Code § 6-2-38(l); *Boyce v. Cassese*, 941 So. 2d 932, 945 (Ala. 2006) ("[N]egligence and wantonness claims are governed by a two-year statute of limitations."); *Jim Walter Homes v. Nicholas*, 843 So. 2d 133, 136 (Ala. 2002) (same).  "The statute of limitations begins to run from the time the plaintiff's cause of action accrues, and there is no 'discovery rule' for negligence claims that would toll the running of the statute of limitations from the time the cause of action was 'discovered' by the plaintiff." *Singer Asset Fin. Co., LLC v. Conn. Gen. Life Ins. Co.*, 975 So. 2d 375, 382 (Ala. Civ. App.

---

*Butler v. Town of Argo*, 871 So. 2d 1, 16-17 (Ala. 2003), her libel and slander claims against Certain are redundant.

[7] Walton-Horton does not dispute that her defamation, libel, and slander claims are time-barred. (Pl.'s Resp. 8.)

2007) (citing *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala. 1993) and *Desouza v. Lauderdale*, 928 So. 2d 1035 (Ala. Civ. App. 2005)).

Based upon these authorities, Walton-Horton must show that the alleged wrongdoing occurred less than two years before she commenced this lawsuit, which was April 7, 2008. It appears that Walton-Horton's negligent and/or wanton supervision claims stem from HMMA's failure to take action against Certain despite Walton-Horton's repeated complaints of harassment and unfair treatment. (Pl.'s Resp. 18.) HMMA terminated Walton-Horton's employment on March 22, 2006; hence, her internal complaints and HMMA's alleged failure to act on these complaints must have occurred prior to Walton-Horton's date of termination.. Viewing the evidence in the light most favorable to Walton-Horton, her negligent and wanton supervision claims accrued before her termination on March 22, 2006, more than two years before she filed her complaint on April 7, 2008. (Doc. # 1.) Walton-Horton does not dispute this fact. (*See* Pl.'s Surrebuttal Br. 13 ("As the record in this case shows[,] the actions complained of by Ms. Walton-Horton occurred prior to 2006.").) Walton-Horton fails to present any evidence showing that her negligent and/or wanton supervision claims are not time-barred. Accordingly, Defendants' motion for summary judgment on Walton-Horton's negligent and/or wanton supervision claims against HMMA is due to be granted.

## V. CONCLUSION

Accordingly, it is ORDERED that Defendant's motion for summary judgment is GRANTED.

It is further ORDERED that the pretrial conference, trial setting, and attendant deadlines are CANCELLED.  An appropriate judgment will be entered.

DONE this 10th day of November, 2009.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE